UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TRADEWALE LLC, *et al.*,<br><br>Defendants. | Civil Action No. 21-17776 (ZNQ) (DEA)<br><br>**OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon an unopposed Motion for Default Judgment (the "Motion," ECF No. 23) filed by Plaintiff Commodity Futures Trading Commission ("CFTC") against Defendant Valdas Dapkus ("Dapkus"). In support of the Motion, Plaintiff filed a Memorandum of Law ("Moving Br.," ECF No. 23-1), and a Declaration of Christopher Giglio ("Giglio Decl.," ECF No. 23-2). After careful consideration of CFTC's submissions, the Court decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78[1] and Local Civil Rule 78.1. For the reasons stated below, the Court will GRANT IN PART and DENY IN PART CFTC's Motion for Default Judgment against Dapkus.

---

[1] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

1

I.   **BACKGROUND**

   A.   **Factual Background**[2]

Dapkus holds himself out as the Manager of Tradewale LLC, an Illinois limited liability company that conducted business during the relevant time period alongside Tradewale Managed Fund, a London entity offering foreign exchange ("forex") investments to the public (collectively, "Tradewale"). (Complaint ("Compl.") ¶¶ 1, 16–18, ECF No. 1.) Both Tradewale entities are named as other defendants in this matter.[3]

From about 2017 to April 2020 (the "Relevant Period"), Tradewale used mail and other means of instrumentalities of interstate commerce to engage in the business of a commodity trading advisor. (*Id.* ¶¶ 1, 20.) Acting through its officers, employees, and agents, including Dapkus, Tradewale solicited the retail public using its website, tradewale.com, to deposit funds in order to achieve specific purported returns based on trading, including by trading forex. (*Id.* ¶ 20.) Tradewale represented to potential customers that it generated average monthly returns of 4-11% and average yearly returns of over 55% APY for its customers, into accounts which can be "easily accessed." (*Id.* ¶¶ 3, 24, 25.) To invest funds with Tradewale, customers were directed to set up accounts by wiring funds to Tradewale's U.S. bank accounts or sending checks to its U.S. business address. (*Id.* ¶¶ 26, 29.) Dapkus personally established, controls, and is the sole authorized signatory for Tradewale's U.S. bank accounts. (*Id.* ¶¶ 18, 26, 38(b).)

Tradewale stated on social media that its customers could trade on the market with "minimal risk and investment" and that its trading systems had been "tested in all market conditions." (*Id.* ¶¶ 21–22.) Tradewale further posted online that it used artificial intelligence to

---

[2]  In keeping with guidance from the Court of Appeals, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true" for the purposes of the current motion. *Comdyne I, Inc. v. Corbin*, 98 F.2d 1142, 1149 (3d Cir.).

[3]  This Court previously granted a motion for default judgment against both of the Tradewale entities. (ECF No. 22.)

2

trade forex—specifically, that Tradewale "has mastered the best AI techniques and teamed [up] with savvy human investment managers" and was "promis[ing] an average of 4.95% monthly return" on forex. (*Id.* ¶¶ 3, 22–23.)

During the Relevant Period, at least fifteen customers deposited a total of at least $700,000 into Tradewale's U.S. bank accounts. (*Id.* ¶ 28.) Customers who invested with Tradewale received online confirmations of their investments, and could initially track purported profits online as well as contact Tradewale customer support. (*Id.* ¶ 29.) However, by in or around mid-2019, customers were unable to withdraw funds from their Tradewale accounts, and were also unable to access the Tradewale website or to contact customer support. (*Id.* ¶ 30.) Most of Tradewale's U.S. customers became unable to withdraw either the funds they invested with Tradewale or any purported profits from their accounts. (*Id.*) Tradewale then dissolved in or around September 2020. (*Id.* ¶ 16.) Neither Tradewale nor Dapkus is registered in any capacity with the CFTC. (*Id.*)

### B.    Procedural Background

On September 29, 2021, the CFTC filed a Complaint against Dapkus and Tradewale alleging violations of the CEA and CFTC regulations under 7 U.S.C. § 6b(a)(2)(A)-(C) (Count I), 17 C.F.R. § 5.2(b) (Count II), and 7 U.S.C. § 6*o*(1) (Count III).[4] (*Id.* ¶¶ 34–52.) The Complaint alleges that Tradewale did not trade forex for customers' accounts as represented, and specifically that Tradewale does not have any trading accounts with futures commission merchants or retail foreign exchange dealers registered with CFTC. (*Id.* ¶ 31.) The Complaint further alleges that Tradewale's bank account statements show that Tradewale used customers' funds not for trading but for expenses incurred at restaurants, drug stores, supermarkets, and department stores, as well as for lodging and cash withdrawals at ATMs. (*Id.*)

---

[4] CFTC only brings Count IV, alleged violations of 7 U.S.C. § 6m(1), against Tradewale. (Moving Br. at 1 n.1.)

On September 29, 2021, a summons was issued that included a notice that failure to respond would result in a default judgment. (ECF No. 2.) After unsuccessful efforts to serve Dapkus, the CFTC filed a motion for service by alternative means via publication or email on December 28, 2021. (ECF No. 5.) The Court denied that motion without prejudice on January 12, 2022. (ECF No. 6.) The CFTC subsequently remained unable to serve Dapkus, and apprised the Court of its ongoing good faith efforts to serve Dapkus in a declaration that it filed on September 3, 2022.[5] (ECF No. 13.) The CFTC then filed a second motion for service by alternative means via publication or email on September 7, 2022, which the Court granted. (ECF Nos. 15, 17.) Per this Court's Order, CFTC eventually effectuated service by publishing notice of this lawsuit against Dapkus in three newspapers that circulated near Dapkus's last known location—the *Chicago Sun-Times*, *Chicago Tribune*, and *Daily Herald*—once per week for a period of four weeks. (ECF Nos. 17–19.) On March 22, 2023, the Clerk entered default as to Dapkus. (*See* between ECF Nos. 20–21.)

As of the date of this Opinion, Dapkus has failed to respond to the Complaint or appear in this action.

## II.   **LEGAL STANDARD**

Rule 55 governs default and default judgment. *See* Fed. R. Civ. P. 55. Pursuant to the Rule, the clerk must enter default against a party who "has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). After an entry of default, a plaintiff may seek default judgment under either Rule 55(b)(1) or Rule 55(b)(2). *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008); *see also Nationwide*

---

[5] The CFTC filed this declaration in response to a Notice of Call for Dismissal Pursuant to Local Civil Rule 41.1(a), which the Court issued on August 10, 2022. (ECF No. 11.) The Notice was later withdrawn. (*See* docket entry between ECF Nos. 15–16.)

*Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 521 n.1 (3d Cir. 2006) ("Prior to obtaining a default judgment under either Rule 55(b)(1) or Rule 55(b)(2), there must be entry of default as provided by Rule 55(a).").

"It is well settled in this Circuit that the entry of a default judgment is left primarily to the discretion of the district court." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). However, "entry of default judgments is disfavored as decisions on the merits are preferred." *Animal Sci. Prods., Inc. v. China Nat'l Metals & Minerals Imp. & Exp. Corp.*, 596 F. Supp. 2d 842, 848 (D.N.J. 2008) (citing *Super 8 Motels, Inc v. Kumar*, Civ. No. 06-5231, 2008 WL 878426, at *3 (D.N.J. Apr. 1, 2008)). In other words, the district court must remain mindful that entry of default "is a sanction of last resort." *Id.*

"Before entering default judgment, the court must address the threshold issue of whether it has subject matter jurisdiction and personal jurisdiction over the parties." *U.S. Life Ins. Co. City of N.Y. v. Romash*, Civ. No. 09-3510, 2010 WL 2400163, at *1 (D.N.J. June 9, 2010) (citing *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986)). After that, "[i]n assessing whether the entry of default judgment is warranted, the court utilizes a three-step analysis, under which the Court must determine (1) whether there is sufficient proof of service[;] (2) whether a sufficient cause of action was stated[;] and (3) whether default judgment is proper[.]" *Paniagua Grp., Inc. v. Hosp. Specialists, LLC*, 183 F. Supp. 3d 591, 599–600 (D.N.J. 2016) (internal quotation marks omitted).

Before determining whether imposing the extreme sanction of default judgment is proper, district courts must make explicit factual findings as to: (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default judgment, and (3) the culpability of the party subject to default. *Sabinsa Corp. v. Prakruti Prods. Pvt. Ltd.*, Civ.

No. 14-4738, 2023 WL 7298471, at *6 (D.N.J. Nov. 6, 2023) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71 (3d Cir. 1987)). An entry of default judgment is not a right that plaintiffs are entitled to and a "defendant's failure to appear or answer does not vitiate the Court's responsibility to examine the complaint." *Paniagua Grp.*, 183 F. Supp. 3d at 600 (internal quotation marks omitted).

### III.  DISCUSSION

#### A.  Subject Matter Jurisdiction and Personal Jurisdiction

This Court possesses jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a–1(a) (2012), which authorizes the CFTC to seek injunctive and other relief in a United States district court against any person whenever it shall appear to the CFTC that such person has engaged in any act or practice that violates the Act or Regulations.

The Court is also satisfied that it has personal jurisdiction over Dapkus. The Complaint includes allegations, which the Court accepts as true in this context, that "certain transactions, acts, practices, and courses of business" of Tradewale "occurred, are occurring, or are about to occur in this District." (Compl. ¶ 14.) The Complaint additionally alleges that during the Relevant Period, at least one customer who invested funds with Tradewale resided in Flemington, New Jersey. (*Id.*) This Court has therefore previously found that it has personal jurisdiction over Tradewale. (*See* ECF No. 22.) As a corporate officer who, according to the Complaint, not only controls the U.S. bank accounts holding customers' money but also appears to have performed some of the actions and omissions that "solicited customers to deposit funds with [Tradewale]" in violation of the Act and Regulations, this Court has personal jurisdiction over Dapkus. (*See* Compl. ¶¶ 8, 20.)

Finally, venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a–1(e) (2012), because the acts and practices in violation of the Act and Regulations occurred within this District.

### B.     Sufficient Proof of Service

Before granting default judgment, the Court must also consider whether process was properly served on Dapkus. Rule 4(e)(1) provides, in relevant part, that "an individual . . . may be served in a judicial district of the United States by: (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). New Jersey law allows for service by the same means as contemplated under the federal rules, *see* N.J. Ct. R. 4:4-4; Fed. R. Civ. P. 4, or by alternative means "when personal service within the state cannot be effected." *Argonaut-Midwest Ins. Co. v. Colt Logistics Inc.*, Civ. No. 18-11783, 2018 WL 6716104, at *2 (D.N.J. Dec. 20, 2018) (citing N.J. Ct. R. 4:4-4(b), 4:4-5).

"[S]ubstitute or constructive service" by alternative means "requires a demonstration of due diligence that satisfies the requirements specified in New Jersey Court Rule 4:4-5(b)" and may be effectuated "as provided by court order." *Id.* (internal quotation marks omitted). On December 1, 2022, this Court concluded that after "Plaintiff's extensive efforts and Plaintiff's continued inability to locate Mr. Dapkus over the course of a diligently spent year,"[6] it was "left with no other option than to grant Plaintiff's [second] request to effectuate alternative service of process," and ordered the CFTC to effectuate service upon Dapkus by publishing notices of this lawsuit in

---

[6] The Court detailed CFTC's unsuccessful but diligent efforts to serve Dapkus: "In the approximately 11 months since the Court's denial of Plaintiff's first motion to alternatively serve Mr. Dapkus, Plaintiff heeded the Court's Order and hired a private investigator, contacted various Postmasters, and provided great specificity as to what steps were taken to locate and serve Mr. Dapkus." (ECF No. 17 at 6–7.)

the *Chicago Sun-Times*, *Chicago Tribune*, and *Daily Herald* newspapers once per week[7] for a period of four weeks. (ECF Nos. 17–19.) The CFTC then published the requisite notices in the newspapers for the requisite frequency and duration. (ECF No. 19, Rasor Decl. ¶ 6.)

The Court therefore finds that service on Dapkus was proper.

### C.     Sufficient Cause of Action

Before entering default judgment, the Court must also review the Complaint and determine whether the "unchallenged facts constitute a legitimate cause of action." *Directv, Inc. v. Asher*, Civ. No. 03-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006) (citing Wright, Miller & Kane, 10A Fed. Prac. & P. Civil 3d § 2688, at 58–59, 63). The Court must also accept CFTC's "well-pleaded" allegations as true. *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1146, 1149 (3d Cir. 1990).

*1. Counts I and II*

Here, CFTC alleges violations of Sections 4b(a)(2)(A)–(C) of the CEA and CFTC Regulations 5.2(b)(1)–(3). (*See* Compl.)

Sections 4b(a)(2)(A) and (C) of the Act prohibit any person or entity from cheating, defrauding, or misleading another person in connection with off-exchange commodity futures or forex contracts. 7 U.S.C. § 6b(a)(2)(A), (C). Sections 4b(a)(2)(A) and (C) apply to forex transactions as if they were futures contracts. *See* 7 U.S.C. § 2(c)(2)(B)(vi). The CFTC may establish a violation of Sections 4b(a)(1)(A) and (C) of the Act by showing that a defendant made a material misrepresentation, misleading statement, or deceptive omission with scienter. *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000). "Scienter is an 'intent to deceive, manipulate, or defraud,' and it may be shown either by conscious behavior or recklessness." *CFTC v. Equity*

---

[7] The Court clarified by Text Order that "the frequency with which Plaintiff . . . shall publish notices in these periodicals [is] once-a-week for a period of four weeks," rather than once per day as originally articulated in the Order. (ECF Nos. 17–18.)

*Fin. Grp. LLC*, 572 F.3d 150, 159 (3d Cir. 2009) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)). A statement or omission is material if "'a reasonable investor would consider it important in making an investment decision.'" *Rosenberg*, 85 F. Supp. 2d at 447 (quoting *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 109 (2d Cir. 1986)). Account balances and profits "'constitute information that a reasonable investor would consider important in trading commodity futures . . . .'" *CFTC v. Cifuentes*, Civ. No. 16-6167, 2018 WL 1904196, at * 5 (D.N.J. Apr. 20, 2018) (quoting *Saxe*, 789 F.2d at 448).

Section 4b(a)(2)(B) of the Act prohibits the creation of false reports or statements in connection with off-exchange futures or forex contracts. 7 U.S.C. § 6b(a)(2)(B). "'Delivering, or causing the delivery of, false account statements to customers relating to forex trades . . . constitutes a violation of Section 4b(a)(2)(B) of the Act.'" *Cifuentes*, 2018 WL 1904196, at *5 (quoting *CFTC v. Total Call Grp.*, Civ. No. 10-513, 2012 WL 1642196, at *7 (E.D. Tex. Mar. 30, 2012).

Regulation 5.2(b) makes it unlawful, in connection with an off-exchange retail forex transaction, to use the mails or any means or instrumentality of interstate commerce to (1) cheat or defraud or attempt to cheat or defraud any person; (2) willfully make a false report or statement; or (3) willfully deceive any person by any means. 17 C.F.R. § 5.2(b).

The facts of the Complaint adequately allege that Dapkus, as an employee of Tradewale, committed the criminal acts and omissions, did so with scienter by intentionally making material misrepresentations and omissions to entice individuals to deposit and invest funds with Tradewale, and then misappropriated those funds for their own benefit.[8] (*See* Compl. ¶¶ 20, 40, 46.)

---

[8] As this Court finds that the Complaint's allegations are sufficient to state a claim for Counts I and II against Dapkus, the Court need not address CFTC's argument for alter ego liability. (*See* Moving Br. at 14 n.3.)

9

*2. Count III*

Section 4*o*(1) of the Act states:

> It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1). "The purpose of § 6o(1) is to 'implement[ ] the fiduciary capacity that characterizes the advisor's relationship to his clients.'" *CFTC v. Perkins*, Civ. No. 06-4674, 2009 WL 806576, at *7 (D.N.J. Mar. 25, 2009) (quoting *CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1980)). "Courts hold that while the language of § 6o(1)(A) requires a defendant to act with scienter, § 6o(1)(B) does not." *Id.* (citing *Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000)).

Sections 4*o*(1)(A) and (B) of the Act apply to CTAs, whether registered or not. *See Perkins*, 2009 WL 806576, at *7 (noting that actual registration as a commodity pool operator with CFTC is not required to "fall within the ambit of § 6o(1)."); *see also CFTC v. Poole*, Civ. No. 05-859, 2006 WL 1174286, at *4 (M.D.N.C. May 1, 2006) (entering default judgment against unregistered defendant for violations of Sections 4(o)(1)(A) and (B)).

Here, the Complaint neglects to allege that Dapkus, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or advisability of trading forex, as described by Section 2(c)(2)(C)(i). (*See* Compl. ¶¶ 48–52; *see also generally* Compl.) The Complaint also does not allege that Dapkus

10

was a Commodity Trading Advisor ("CTA") as defined in Section 1a(12)(A)(i). (*See id.* ¶¶ 48–52; *see also generally id.*)

Accordingly, the Court finds that the Complaint does not sufficiently allege that Dapkus violated Section 4*o*(1) of the Act (Count III).[9]

### D. Whether Default Judgment is Proper

Next, the Court considers whether default judgment is proper. Here, Dapkus is subject to default because he has failed to respond to the Complaint. In the absence of a responsive pleading, there is nothing in the record to indicate that Dapkus has any meritorious defenses.

Second, Dapkus's failure to respond and litigate this action would leave Plaintiff without a remedy to obtain damages that resulted from his fraud or misrepresentations. Additionally, Dapkus's failure to litigate this action will result in CFTC being unable to fulfill its congressional mandate of enforcing the Act. Therefore, this Court finds that Plaintiff has been prejudiced and will continue to be further prejudiced if default judgment is not granted.

Third, this Court finds that Dapkus is presumably culpable due to his failure to respond to this action despite being properly served with the Complaint and Summons. *Slover v. Live Universe, Inc.*, Civ. No. 08-2645, 2009 WL 606133, at *2 (D.N.J. Mar. 9, 2009) ("Defendant is also presumed culpable where [he] has failed to answer, move, or otherwise respond"). As of the date of this Opinion, Dapkus has not responded to the Complaint. Therefore, given that Plaintiff satisfies all of the necessary requirements, the Court will enter default judgment for Plaintiff.

---

[9] CFTC argues in its Moving Brief that Dapkus was a person "associated with a CTA" under the Act "as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of a client's or prospective client's discretionary account or (ii) the supervision of any person or persons so engaged and, therefore, was an Associated Person of a CTA under Section 4k of the Act. 7 U.S.C. § 6k." (Moving Br. at 16). However, the Complaint does not allege that Dapkus was one such associated person under Section 4k. (*See generally* Compl.)

11

E.     **Permanent Injunction**

Section 6c(a) of the Act, 7 U.S.C. § 13a–1(a) (2012), authorizes the CFTC to seek, and the Court to impose, injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged in any act or practice that violates the Act or Regulations.

The "'ultimate test'" for entry of an injunction under the Act "'is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *CFTC v. Siegel*, Civ. No. 13-5755, 2014 WL 7404537, at *9 (D.N.J. Dec. 30, 2014) (quoting *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008)). Future violations of the Act or Regulations "may be inferred, or even presumed, from past unlawful conduct, and the absence of proof to the contrary." *CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 171 (D.N.J. 1988) (citing *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

"The scope of injunctive relief can be tailored to meet the circumstances of the violations shown." *Cifuentes*, 2018 WL 1904196, at *8. Courts have entered permanent injunctions against future violations of the Act. *See, e.g., Rosenberg*, 85 F. Supp. 2d at 454–55 (permanently enjoining defendants "from future violations of" provisions of the Act). Courts have also permanently enjoined defendants from registering with the CFTC and engaging in any commodity-related activity. *See Cifuentes*, 2018 WL 1904196, at *8 (imposing permanent trading and registration bans); *see also Wilshire*, 531 F.3d at 1346 (11th Circuit upholding the district court's permanent injunction prohibiting the defendants from "engaging in any commodity-related activity").

As set forth above, the well-pleaded facts of the Complaint establish that Dapkus's unlawful conduct makes it highly likely that he will be a repeat violator unless permanently restrained by this Court. *See Am. Metals Exch. Corp.*, 693 F. Supp. At 171. As alleged, Dapkus "fraudulently solicited members of the public for the purported purpose of trading off-exchange,

retail foreign currency on a leveraged or margined basis ("forex") in accounts to be managed by Tradewale, and misappropriated customers' funds" in violation of the Act and Regulations. (Compl. ¶ 1.) Dapkus created, controls, and is the sole authorized signatory for Tradewale's U.S. bank accounts that held customers' money, (Compl. ¶¶ 18, 26, 38(b)); those account statements reflect that Tradewale did not use customers' funds to trade forex as represented but rather for "restaurants, drug stores, supermarkets, department stores, lodging, and cash withdrawals at ATMs." (Compl. ¶ 31.) Injunctive relief is appropriate in these circumstances. *See Rosenberg*, 85 F. Supp. 2d at 454 (granting CFTC's motion for permanent injunction because defendants' misappropriation of customer funds was "egregiously fraudulent conduct" that made future violations of the Act likely).

Therefore, the Court finds that there is a reasonable likelihood that Dapkus will continue to violate the Act and Regulations unless permanently restrained and enjoined by the Court. The intentional and egregious nature of Dapkus's fraudulent conduct warrants permanent injunctive relief, including registration and trading bans.

### F. Restitution and Civil Monetary Penalty

#### 1. *Restitution*

Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a–1(d)(3)(A) (2012), authorizes the Commission to seek, and the Court to impose, equitable remedies for violations of the Act, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a–1(d)(3)(A). "Courts calculate restitution 'as the difference between what Defendants obtained and the amount customers have already received back.'" *Cifuentes*, 2018 WL 1904196, at *10 (quoting *CFTC v. Ross*, Civ. No. 09-54432, 2014 WL 6704572, at *3 (N.D. Ill. Nov. 26, 2014)).

13

As a result of Tradewale's fraudulent solicitations, Tradewale received a total of at least $713,520.00 from at least 17 customers. (Giglo Decl. ¶ 20(b), Ex. D.) None of these customers have received any return of their principal investment. (*Id.* ¶ 20(c).) As such, this Court previously ordered Tradewale to pay, on a joint and several basis, restitution in the amount of $713,520.00 (seven-hundred thirteen thousand, five-hundred and twenty dollars) (the "Tradewale Restitution Amount"), with post-judgment interest accruing since that same day pursuant to 28 U.S.C. § 1961 (2012). (ECF Nos. 21, 22.) This Court additionally appointed the National Futures Association ("NFA") as monitor to supervise the distribution of the restitution funds to the affected customers. (ECF No. 21 at 15.)

Given that this Court finds Dapkus to be in violation of Counts I and II per the Complaint's sufficient allegations, the Court hereby holds that Dapkus shall be held jointly and severally liable alongside Tradewale for the Tradewale Restitution Amount of $713,520.00.

### 2. *Civil Monetary Penalty*

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a–1(d)(1) (2012), and Regulation 143.8(a)(4)(ii)(B), 17 C.F.R. § 143.8(a)(4)(ii)(B) (2016), authorize the CFTC to seek, and the Court to impose, a civil monetary penalty of triple Defendants' monetary gain from each violation of the Act or Regulations, or $167,728 per violation, whichever is greater.

The Court considers numerous factors in determining an appropriate civil monetary penalty under the Act, including (1) whether Defendants' illegal acts violated core provisions of the Act; (2) whether Defendants acted with scienter; (3) the consequences resulting from Defendants' violations; (4) the financial benefits to Defendants; and (4) the harm to Defendants' customers. *See Wilshire*, 531 F.3d at 1346; *see also CFTC v. Yorkshire Grp., Inc.*, Civ. No. 13-5323, 2016 WL 8256380, at *6 (E.D.N.Y. Aug. 19, 2016).

Courts have routinely awarded civil monetary penalties in cases involving fraud. *See, e.g., CFTC v. Onsa*, 2014 WL 2960345, at *1 (E.D. Pa. Mar. 20, 2014) (entering civil monetary penalty of triple defendants' gain in commodity pool fraud case due to "the egregiousness of the defendants' intentional conduct"); *see also CFTC v. SK Madison Commodities, LLC*, 2014 WL 3887755, at *5 (S.D.N.Y. June 9, 2014) (entering default judgment and ordering a civil monetary penalty of "triple the amount misappropriated" where defendants "committed repeated violations of core provisions of the[Act] and Regulations"); *CFTC v. Rolando*, 589 F. Supp. 2d 159, 174 (D. Conn. 2008) ("obtaining customer funds and then hiding [defendant's] true conduct from his customers were serious violations of the Act …that strike at the very core of the Act's regulatory system," requiring "a substantial civil monetary penalty.")

This Court previously imposed civil monetary penalties on Tradewale in the amount of triple the customer funds that were misappropriated. (ECF No. 21 at 17.) As Dapkus's conduct also warrants the imposition of a significant monetary penalty, the Court hereby holds that Dapkus shall be jointly and severally liable with Tradewale for that same amount, $2,140,560. The Court believes this civil monetary penalty against Dapkus is proper to deter future fraudulent schemes in violation of the Act and Regulations. *See Cifuentes*, 2018 WL 1904196, at *12. This penalty is authorized by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a–1(d)(1) (2012), and Regulation 143.8(a)(4)(ii)(B), 17 C.F.R. § 143.8(a)(4)(ii)(B) (2016).

## IV. CONCLUSION

For the reasons stated above, the Motion for Default Judgment will be granted in part and denied in part. Judgment will be entered in favor of Plaintiff and against Defendant Dapkus as to Counts I and II of the Complaint. A permanent injunction and a judgment in the amounts set forth above will be entered in favor of Plaintiff. An appropriate Order will follow.

**Dated: November 28, 2023**

ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE